**E-FILED**
Monday, 10 December, 2007  11:55:11 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| Michael Lemberger, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 3:07-cv-03212-HAB-CHE |
| v. | ) | |
| | ) | |
| Sandra Simpson, Anderson Freeman and Brian | ) | |
| Thomas, | ) | |
| | ) | |
| Defendants. | ) | |

**12(B)(6) MOTION TO DISMISS**

Now Comes the Defendant, Sandra Simpson, by and through her counsel, James C. Vlahakis, and pursuant to FRCP 12(b)(6), moves for the dismissal of Plaintiff's Complaint with prejudice and in support states the following:

**I.     Introduction**

1.     Plaintiff has been civilly detained by the State of Illinois pursuant to the Sexually Violent Persons Commitment Act (725 ILCS 205/1, *et seq*.) at a Illinois Department of Human Services operated Treatment and Detention Facility for Sexually Violent Persons ("TDF") located in Rushville, Illinois.  In light of recent lawsuits filed by residents of the TDF, this Court can take judicial notice that TDF which houses Plaintiff is operated by DHS.

2.     A review of Pacer indicates that this case is Plaintiff's second of three civil rights Complaints which he has filed pursuant to 42 U.S.C. § 1983.  Plaintiff complains that he has been denied a Kosher diet and that he has been unable to practice the Passover.  Ex. A, Complaint, pp. 4-5.  Plaintiff claims that he has been denied a pork substitute and that he has missed an unidentified amount of meals.  *Id*.  Plaintiff also appears to claim that he *may not* be able to practice Chanukah.

3.    Plaintiff has sued the following three (3) individuals:  Grievance Examiner Sandra Simpson; Acting DHS Facility Director Brian Thomas; and DHS Program Facility Director Anderson Freeman.    Ex. A, pp. 1-2.    Ms. Simpson is employed by Liberty Healthcare Corporation, an contractor with DHS who employees sex offender treatment specialists.

## II.    Legal Standards

### A.    12(b)(6) Standards

4.    *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955 (2007) holds that "[i]t is not . . . proper to assume that [plaintiff] can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Id*. at 1969 n.8.  A "pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id*. at 1965.

5.    As discussed below, Plaintiff has failed to allege an actionable violation of the First Amendment of the Constitution.

### B.    The Legal Rights of Sexually Violent Persons ("SVPs")

6.    The Seventh Circuit has previously held that while SVPs are akin to pre-trial detainees, their claims should be reviewed under the Eighth Amendment's deliberate indifference standard.  *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005).  Accordingly, Eighth Amendment cases involving prisoners provide a proper baseline to examine whether Plaintiff's First Amendment rights have been violated.

7.    The district court in *Young v. Bass*, 2004 WL 765874 (N.D. Ill. 2004) examined a denial of religion claim brought by a Muslin resident of the DHS SVP facility located Joliet, Illinois.  Exhibit B.  In *Young*, the plaintiff claimed that he was denied of the following:  a pork-free diet; access to an outside religious leader (a Imam); the ability to worship during Ramadan;

6261796v1 794835

the right to wear a headdress (a Kufi); and free religious items such as a Koran and prayer rug. *Id.* at \*3-\*4. While Young was decided on summary judgment, the court's analysis of what the Constitution requires is instructive.

8.     Examining these claims, the district court held that "a detainee's free exercise of his 'religious beliefs does not demand upon his ability to purse each and every aspect of his religion.'" *Id.* at \*5 (quoting *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir. 1996). The court held that it was undisputed that food served at the Joliet TDF did not contain pork products. *Id.*[1] More importantly, the district court held that that TDF staff were not required to provide him with free religious materials. *Id.* at \*6 ("these authorities are not required to supply every detainee with religious materials at no cost"). According to the court,

> [C]onfinement facilities, like the Joliet Facility, must consider many factors in using general revenue funds, such as the State's obligation to meet the basic and rehabilitative needs of the residents at the Joliet Facility. *Al-Almain v. Gamley*, 926 F.2d 680, 686 (7th Cir. 1991). Providing every possible religions item desired by a detainee at no cost, in the professional judgment of the Joliet Facility officials, would not be economically feasible and would not be feasible based on the space available at the Joliet Facility. It would be practically impossible to stock the commissary with every religious item desired by the detainees.

*Young v. Bass*, 2004 WL 765874 at \*6 (full citation to *Al-Almain* provided).

9.     Against this backdrop, it is clear that Plaintiff's right to practice his faith was not violated simply because Ms. Simpson recommended that his various grievances be denied. Plaintiff has not alleged that she was personally responsible for denying him the ability to practice his religion. Moreover, Plaintiff has not demonstrated that he was denied the ability to practice his religion. Alternatively, Ms. Simpson was not required to cater to his every desire. Even if she was required to under the facts alleged, she is entitled to qualified immunity.

---

[1]     It should be noted that a different food vendor provides services at the Rushville TDF.

3

III.    **Arguments in Support of Dismissal**

A.      **The Absence of Personal Liability**

10.     Section 1983 "liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir.1996); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Here, Plaintiff has failed to allege that Ms. Simpson was personally involved in denying him the ability to practice his religion. Plaintiff does not allege that she prepared the menu or the food in question or that she denied him access to a Rabbi. All he has alleged is that she denied his various grievances and this fact, even if true, does not violate the Constitution. *See* Argument C.

11.     Under *Twombly*'s plausible liability standard, it is *not proper* to assume that Plaintiff can prove facts which he chooses not to allege against Ms. Simpson. 127 S.Ct. at 1969.

B.      **Ms. Simpson Was Not the Cause in Fact of Plaintiff's Injuries**

12.     This Court can take judicial notice of the fact that grievance examiners within the Illinois Department of Corrections (and the Department of Human Services in this case) simply review grievances, make recommendations, without having the independent power to order any particular relief. *See also*, 59 ILAC 299.820(d) ("The Grievance Examiner or treatment team shall consider the grievance and report findings and recommendations in writing to the Program Director (Defendant Thomas) within 15 working days after the grievance is received by the Grievance Examiner or treatment team, whenever possible."). Rather, the power to order change resets solely with the Facility's Program Director. *Id.* ("The Program Director shall advise the resident of the decision in writing within 10 working days after receiving the Grievance

6261796v1 794835

Examiner's or treatment team's report, whenever possible."). Program Director Thomas' signature affixed to Plaintiff's grievance. *See* Exhibit A, p. 11.

13. The Illinois Administrative Code further provides that a resident can appeal the determination of the Program Director to the Program Administrator (Defendant Anderson). *See* 59 ILAC 299.840(b) ("The Program Administrator shall review the grievance and the responses of the Grievance Examiner and Program Director. If it is determined that the grievance is without merit, the resident shall be advised of this disposition, in writing, within 30 working days after receipt of the grievance."). Plaintiff has utilized this appeal form and his appeal was denied *See* Exhibit A, pp. 8, 11.

14. Accordingly, Ms. Simpson, is not the cause in fact of Plaintiff's purported injuries. If that anyone is responsible for the denial of a pork substituted and the related claims, it is Plaintiff's custodian, the Department of Human Services ("DHS"). Plaintiff overlooks the fact that Ms. Simpson instructed him to forward the name of a Rabbi to Defendant Thomas. *See* Exhibit A, p. 11. This demonstrates that she is hardly indifferent to his claims. Whether she is "ignorant" of the specifics of a Kosher diet as Plaintiff claims is irrelevant from a Constitutional standpoint. To hold otherwise would cause staff to be learned scholars on all religions. The Constitution does not require such a level of knowledge. Finally, Plaintiff claims that he was told by *DHS security staff* that he would be unable to light candles at Chanukah. *See* Exhibit A, p. 10.

15. In summary, because Ms. Simpson lacks the power to change any DHS practices, Plaintiff has essentially shot-the-messenger for something she simply reported. Plaintiff does not have a constitutional claim against her in her capacity as the messenger.

5

**C.**     **No Constitutional Right to Have Grievance Upheld**

16.     Defendant Simpson has been sued because she denied Plaintiff's various grievances. Plaintiff, however, cannot state a constitutional claim against Ms. Simpson on the basis that she denied his grievances. *See, e.g., Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir.1996); *Greer v. DeRobertis*, 568 F.Supp. 1370, 1374 (N.D. Ill. 1983) (As Greer concedes, the Fourteenth Amendment does not mandate administrative review of prison disciplinary actions. That well-settled proposition necessarily undercuts Greer's bald assertion that Allen was obligated to respond to his grievance, for that is just another way of saying Greer was entitled to invoke Stateville's grievance machinery" (citations omitted); *Azeez v. DeRobertis*, 568 F.Supp. 8, 10 (N.D. Ill. 1982). *See also*, *Grant v. Sutton*, 2006 WL 2802050, *3 (S.D. Ill. 2006) ("There is no constitutional right to a grievance procedure . . . so their failure to provide a satisfactory response to his complaints is not a separate constitutional violation."); *Agrawal v. Briley*, 2003 WL 164225 (N.D. Ill. 2003) ("There is no constitutional right to a grievance procedure . . . so her recommendation that the grievance be denied was not a new constitutional violation.").

17.     In light of these authorities, Plaintiff should be strongly cautioned about suing Ms. Simpson in future Complaints in her role as grievance examiner as such a suit would amount to vexation litigation in violation of 28 U.S.C § 1927.

**D.**     **It Was Proper for Ms. Simpson to Rely on Security Staff's Opinions**

18.     Furthermore, Ms. Simpson is entitled to dismissal based upon her reliance on the opinions of security staff who rejected Plaintiff's requests to light Chanukah candles. *See, e.g., Greeno v. Daley*, 414 F.3d 654, 656 (7th Cir. 2005) ("If a prisoner is under the care of [security staff] . . . , a non-[security] prison official will generally be justified in believing that the prisoner is in capable hands. While *Greeno* involved a medical claim, its rationale should apply here

6

because it strain the division of labor at the Facility to have a grievance examiner overrule security staff. *Id.* ("Holding a non-medical prison official liable in a case of where a prisoner was under a physician's care would strain this division of labor.").

19.    As noted above, Plaintiff claims that he was told by *DHS security staff* that he would be unable to light candles at Chanukah. *See* Exhibit A, p. 10. Ms. Simpson's grievance response provides that the same security official told her that candles are banned.

### E.    Plaintiff's Claims are *De Minimis*

20.    Plaintiff's missed meals are arguably *de minimis* injuries. *See, e.g., Young*, 2004 WL 765874, *6 (holding that two missed meals and six or seven missed meals during Ramadan by a resident detained under the SVP Act "presents a de minimis burden on Plaintiff's free exercise of his religion and fails to rise to a constitutional dimension") (Ex. B).

### F.    Qualified Immunity

21.    Alternatively, Defendant Simpson is entitled to qualified immunity. Qualified immunity shields defendants against civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is designed to shield from civil liability all "but the plainly incompetent or those who knowingly violate the law," and "gives public officials the benefit of legal doubts." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175, 1177 (7th Cir. 1994) (affirming award of immunity in the context of a 12(b)(6) motion). Plaintiff must prove that this defense does not apply. Defendant is entitled to qualified immunity as the facts do not demonstrate that a reasonable individual in her position would have clearly known that her conduct violated the Constitution. *Id.*

6261796v1 794835

22.    While this Court may find that Defendant Simpson is entitled to qualified immunity on the basis that Plaintiff has failed to demonstrate a constitutional violation, the application of this defense is important as it may serve in future cases to defeat claims of a constitutional magnitude.  Currently, the issues of whether employees of Liberty Healthcare are entitled to qualified immunity is pending before the Seventh Circuit Court of Appeals in the case of *Sain v. Budz*, 06 3919, which was argued on September 27, 2007.  Defendant will supplement this brief as soon as a ruling is issued.

23.    Defendant is entitled to qualified immunity notwithstanding the fact that she is employed by a contractor with the State of Illinois.  The Seventh Circuit has historically applied qualified immunity to privately employed mental health workers who have provided quasi-governmental services under contract with governmental entities.  While the Supreme Court has declined to provide qualified immunity to privately employed prison guards in *Richardson v. McKnight*, 521 U.S. 399 (1997), *Richardson* is limited to its narrow facts.  *Payton v. Rush-Presbyterian-St. Luke's Med. Ctn.*, 184 F.3d 623, 631 (7th Cir. 1999) ("[*Richardson*] answered the immunity question narrowly in the context in which is arose").

24.    *Richardson* is distinguishable because held that the private prisoner guards were not entitled to qualified immunity *because the management of prisoners was historically not an exclusively public function*.  *Id.* at 404-07.  Second, *Richardson* limited the denial of qualified immunity to the facts of the case which involved "a private firm, systematically organized to assume a major lengthy administrative task . . . with limited direct supervision by the government."  *Id.* at 413.  Ultimately, *Richardson* suggested that qualified immunity would be appropriate in cases where a contract employee is only "briefly associated with a government

body, serving as an adjunct to government in an essential government activity, or acting under close official supervision." *Id.*

25.     Qualified immunity is proper as the SVP Act serves a unique public function and a recent one at that.  Significantly, the Illinois Supreme Court, in holding that the SVP Act legitimately "extend[s] the incarceration of criminal defendants beyond the time whey would otherwise be entitled to release if those defendants are found to be 'sexually violent,'" noted that "substantial differences" exist between the SVP Act and the Illinois Mental Health Code and Developmental Disabilities Code ("Mental Health Code").  *In re Samuelson*, 727 N.E.2d at 237. *See also, Hargett*, 2005 WL  399300 at *19-*20.  These facts demonstrate that the SVP Act serves a very unique public function, the involuntary detention and treatment of violent sex offenders, and that this public function has no counterpart in the private sector

26.     Qualified immunity is also warranted given Defendant's limited role in reviewing grievances at the DHS operated (and DOC owned) Treatment and Detention Facility.  *See, e.g.,* 725 ILCS 207/50(b) ("The Department shall operate the facility provided by the Department of Corrections under this subsection and shall provide by rule for the nature of the facility, the level of care to be provided in the facility, and the custody and discipline of persons placed in the facility.").  Further, DHS, not Defendant, "provide[s] by rule for the nature of the facility, the level of care to be provided in the facility, and the custody and discipline of persons placed in the facility."  *See* 725 ILCS § 207/50(b).  DHS's role in operating the detention facility and State's enactment of sex offender treatment standards under the SEX OFFENDER MANAGEMENT BOARD, *see, e.g.,* 20 Ill.Admin.Code §§ 1900.80, 1900.100, 1990.140 and 1900.150, distinguishes this case from *Richardson.*

6261796v1 794835

27.    Finally, applying the *Richardson* test, qualified immunity has been historically afforded to private doctors employed under contract with governmental agencies.  For example, *Sherman v. Four County Counseling Center*, 987 F.2d 397 (7th Cir. 1993) awarded immunity to a *private* mental institution that had treated a mentally ill patient pursuant:

> Four County accepted and treated Sherman pursuant to court order and in accordance with the procedures set forth by Indiana law . . . .  It seems clear that a state hospital that acted precisely as Four County did would be protected by qualified immunity.
> * * *
> We believe the public interest . . . for the detention and treatment of the mentally ill is best served by not exposing private facilities to liability for discretionary medical judgment made under court order.

*Id*. at 405-06.  *See also*, *Young v. Murphy*, 90 F.3d 1225, 1234 (7th Cir. 1996); *Williams v. O'Leary*, 55 F.3d 320, 324 (7th Cir. 1995).

28.    In summary, the detention of, and delivery of sex offender treatment to civilly confined and detained individuals pursuant to the SVP Act is a uniquely governmental function, and was enacted less than ten years ago.  The SVP represents a purely governmental function, unlike the operation of private prisoners which are a historical fact.  The DHS Facility is operated by DHS, which contracts out the delivery of sex offender treatment to Ms. Simpson's employer (Liberty Healthcare).  For these reasons, *Richardson* does not apply to the facts of this case.

29.    In her capacity as a grievance examiner, it has never been clearly established that the particular deprivations that Plaintiff complains about violate the Constitution.  Put another way, given the relatively recent adoption of the SVP Act, it is not clear that reasonable officials (contract or otherwise) would have known that Plaintiff was complaining of a deprivation of a constitutional magnitude, especially given Ms. Simpson's limited role in *recommending* the outcome of grievances (and not as a policymaker).

6261796v1 794835

Respectfully submitted,


/s/ James C. Vlahakis
James C. Vlahakis
222 N. LaSalle, Suite 300
Chicago, IL 60601
Telephone: 312-704-3000
Facsimile: 312-704-3001

6261796v1 794835

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 10, 2007, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following to all counsel of record.

I further certify that on December 11, 2007, I mailed a copy of the above document to the following party of record:

       Michael Lemberger
       Department of Human Services
       R.R. #1, Box 6A
       Rushville, IL 62681

By:  /s/ James Vlahakis

James C. Vlahakis
HINSHAW & CULBERTSON LLP
222 North LaSalle Street, Suite 300
Chicago, IL 60601
312-704-3000

6261796v1 794835

E-FILED
Monday, 10 December, 2007 05:02:01 PM
Clerk, U.S. District Court, ILCD

# United States District Court

## CENTRAL DISTRICT OF ILLINOIS

FILED

AUG 0 8 2007

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

,

| | | |
|---|---|---|
| Michael Lemberger **Plaintiff** | ) ) ) | |
| vs. | ) | Case No. _07-3212_ |
| | ) | *The case number will be assigned by the* |

clerk)

Sandra Simpson )

Anderson Freeman )

Brian Thomas )

~~████████████████~~ )

)

)

)

,

)

**Defendant(s)** )

*(List the full name of ALL plaintiffs and defendants in the caption above.  If you need more room, attach a separate caption page in the above format).*

## COMPLAINT*

*Indicate below the federal legal basis for your complaint, if known.  This form is designed primarily for pro se prisoners challenging the constitutionality of their conditions of confinement, claims which are often*

---

*\*Please refer to the instructions when filling out this complaint.  Prisoners are not required to use this form or to answer all the questions on this form in order to file a complaint.  This is not the form to file a habeas corpus petition.*

*brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "Bivens" action (against federal defendants). However, 42 U.S.C. § 1983 and "Bivens" do not cover all prisoners' claims. Many prisoners' legal claims arise from other federal laws. Your particular claim may be based on different or additional sources of federal law. You may adapt this form to your claim or draft your own complaint.*

☑ 42 U.S.C. §1983 (state, county or municipal defendants)

☐ Action under *Bivens v. Six Unknown Federal Narcotics Agents* , 403 U.S. 388 (1971)(federal defendants)

☐ Other federal law: _____

_____

☑ Unknown   Religon _____

_____

## I. FEDERAL JURISDICTION

Jurisdiction is based on 28 U.S.C. § 1331, a civil action arising under the United States Constitution or other federal law. *(You may assert a different jurisdictional basis, if appropriate).*

## II. PARTIES

A. Plaintiff:

Full Name:   Michael Lemberger _____

Prison Identification Number: _____

Current address:   R.R. 1, Box 6-A _____

_____ Rushville, Illinois   62681 _____

*For additional plaintiffs, provide the information in the same format as above on a separate page. If there is more than one plaintiff, each plaintiff must sign the Complaint, and each plaintiff is responsible for paying his or her own complete, separate filing fee.*

B. Defendants

Defendant #1:

Full Name:   Sandra Simpson _____

2

Current Job Title: _Grievance Offical_

Current Work Address _R.R. 1, Box 6A_

_Rushville, Illinois 62681_

Defendant #2:

Full Name: _Anderson Freeman_

Current Job Title: _Program Facility Director_

Current Work Address _R.R. 1, Box 6-A_

_Rushville, Illinois, 62681_

Defendant #3:

Full Name: _Brian Thomas_

Current Job Title: _Facility Director_

Current Work Address _R.R. 1, Box 6A_

_Rushville, Illinois 62681_

Defendant #4:

Full Name: _____

Current Job Title: _____

Current Work Address _____

_____

Defendant #5:

Full Name: _____

Current Job Title: _____

Current Work Address _____

_____

3

*For additional defendants, provide the information in the same format as above on a separate page.*

## III.  LITIGATION HISTORY

The *"three strikes rule"* bars a prisoner from bringing a civil action or appeal *in forma pauperis* in federal court if that prisoner has "on 3 or more occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

A.  Have you brought any other lawsuits in state or federal court dealing with the same facts involved

in this case?          Yes  ☐          No  ☑

If yes, please describe _____

_____

B.  Have you brought any other lawsuits in federal court while incarcerated?

Yes  ☐          No  ☑   *But I HAVE BROUGHT A lawsuit since my ARRIVAL at D.H.S. - T.D.F.*

C.  If your answer to B is yes, how many?  ___/___  Describe the lawsuit(s) below.

1.  Name of Case, Court and Docket Number
  *CASE No.  07-3128*

2.  Basic claim made  *ENVIRONMENTAL tobacco Smoke (ETS)*

3.  Disposition (That is, how did the case end?  Was the case dismissed?  Was it appealed?  Is it still

pending?)  *Case still pending.*

*For additional cases, provide the above information in the same format on a separate page.*

## IV.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

Prisoners must exhaust available administrative remedies before filing an action in federal court about prison conditions. 42 U.S.C. § 1997e(a). You are not required to allege or prove exhaustion of administrative remedies in the complaint.  However, your case must be dismissed if the defendants show that you have not exhausted your administrative remedies, or if lack of exhaustion is clear from the complaint

4

*and its attachments.  You may attach copies of materials relating to exhaustion, such as grievances, appeals, and official responses.  These materials are not required to file a complaint, but they may assist the court in understanding your claim.*

A.  Is there a grievance procedure available at your institution?  Yes  ☑  No  ☐

B.  Have you filed a grievance concerning the facts relating to this complaint?

Yes  ☑  No  ☐

If your answer is no, explain why not _____

_____

C.  Is the grievance process completed?  Yes  ☑  No  ☐

## V.  STATEMENT OF CLAIM

Place(s) of the occurrence  <u>Department of Human Services Detention and Treatment Facility</u>

<u>Rushville Illinois.</u>

Date(s) of the occurrence  <u>12-8-07  until present and ongoing.</u>

*State here briefly the FACTS that support your case.  Describe what each defendant did to violate your federal rights.  You do not need to give any legal arguments or cite cases or statutes.  Number each claim in a separate paragraph.  Unrelated claims should be raised in a separate civil action.*

**THE COURT URGES YOU TO USE ONLY THE SPACE PROVIDED.**  *Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement" of your claim showing that you are entitled to relief. It is best to include only the basic, relevant facts, including dates, places, and names.*

<u>I am Jewish, I am being ~~denied~~ Denied a Kosher Diet, I am, and have been ~~Denied~~ Denied</u>

<u>an alternitive to pork, I have had to skip meals as a result of this, I have been</u>

<u>Denied observance of ~~██████████████~~ Passover and told that I would</u>

5

not be able to observe Chanukah as well.

I followed the Grivance Procidure here at D.H.S. —T.D.F. And each Defendant Denied my request And signed off on that Denial. As a result I feel that each Defendant is equally guilty of Denieing my right to express my religious beliefs as protected by law, Furthermore, I feel that each Defendant is both Criminal And negligent by allowing me to miss meals, by not at least giving me a pork substitute, I also find it hard to beleive that Mrs. Simpsons claim of Ignorance of what a Kosher Diet is, ispreposterous And pernicious towards me. I find it hard to believe that an institution, run by the state of Illinois, is not familiar with Kosher food, even if that's the case, I DID, IN fact, explaine what a Kosher Diet was.

Please see attached Grievance

## RELIEF REQUESTED

*(State what relief you want from the court.)*

I AM seeking NOMINAL, compensatory And punitive
DAMAGES, I AM seeking Assurance that my Religious Rights Are
protected And that I be allowed observance of All Jewish hollidays,
And I AM seeking A kosher Diet consistant with my Religious Beliefs,
I AM unable to set or request A monetary value for
DAMAGes, As the DAMAGes Are still being incurred

**JURY DEMAND**      Yes ☐          No ☑

Signed this ~~8~~ 6TH day of August , 20 07 .

*Michael Lemberger*
**( Signature of Plaintiff)**

10

| Name of Plaintiff: Michael Lemberger | Inmate Identification Number: |
|---|---|
| Address: R.R. 1, Box 6-A<br>Rushville, Illinois, 62681 | Telephone Number:<br>217-322-3204 |

State of Illinois
Department of Human Services

# TDF Resident Grievance - Appeal Form



| Name of Resident: | Lemberger | ID #: | Date of Submitted: | 6-13-07 | Unit: | D-3 |
|---|---|---|---|---|---|---|

| Date Received by Administration: | 06-14-07 A09:24 IN | Grievance #: | 05 07 GR 0350 |
|---|---|---|---|

USE BLACK INK ONLY

SUMMARY OF GRIEVANCE APPEAL:

I notified S.T.A. 2 Parsons and T.D.F. Nursing staff upon my arrival at T.D.F of my religious affiliation, I also informed Mr. Hanson durring his initial interview that I was Jewish. To suggest that my Primary Therapist should verify my religious beliefs is an Outrage. I provided D.H.S. T.D.F. of my religious affiliation and I requested a Kosher Diet and I requested to see a Rabbi. Unless this information has been misplaced, or someone neglected to record it, or it has somehow been removed from my file, what you are doing is a blatant violation of the First Amendment which guarantees my right to exercise my religious beliefs. Recognizing that right is "preferred", that is, of particular significance under the Constitution. I am requesting that you Re-consider Sandra Simpson's erroneous mistake and allow me my fundamental right to enjoy my religious beliefs as I understand them and that T.D.F. D.H.S. make a good faith effort to stand behind there statements as outlined on page 21, under Religion, contained in the Resident Hand book.

Resident's Signature: _Lemberger_

ALL GRIEVANCE APPEALS MUST BE FILED ON THIS OFFICIAL GRIEVANCE APPEAL FORM

Grievance must be filed within 30 days after receipt of the Facility Director's response. Please attach the grievance with the Grievance Examiner's report and the Facility Director's decision. Forward to the Grievance Examiner.

State of Illinois
Department of Human Services

# TDF Resident Grievance



| | | | |
|---|---|---|---|
| Name of Resident: *Lemberger* | ID #: | Date of Incident Occurrence: 5-11-07 | Unit: D-3 |

| | | |
|---|---|---|
| Date Received    05-14-07 P04:00 IN | Grievance #: | 05 07 GR 0350 |

**Nature of Grievance**
☐ Personal Property  ☐ Staff Conduct  ☐ Mail Handling  ☐ Meals  ☐ Medical  ☒ Other:  (Specify): *Religion*

☐ Disciplinary Report:    Report Date: _____

(Attach copy of Notice of Appearance Before The Behavior Committee and Behavior Committee Decision.)

Use only this form to give a BRIEF Summary of Grievance:

Since my arrival at D.H.S.T.D.F. on Dec. 8TH 2006 my Religious Rights and Requests have been compleatly ignored. I informed The Staff upon my arrival at D.H.S.T.D.F. that my religious affiliation was Jewish, that when ever possiable I keep Kosher, and that I would like to see a Rabbi. I even went so far as to give D.H.S.T.D.F. Staff the name of a Rabbi that would come this far to see me, and all of my efforts have been Ignored. However, I was told by Capt. Biermann that under no circumstances would I ever be allowed to light Menorah Candles on Chanukah in observance of the Jewish peoples exodus from Slavery and Bondage while in Egypt. Never mind the fact that D.H.S.T.D.F supplies matches to the residents. In this Grievant's opinion, ignoring a persons fundamental right to observe there Religious Rights is A-kin to denial and unconscionable, bordering on criminal.

Relief Requested: I want a diet thats consistant with my Religious Beliefs - I want to see a Rabbi - I want to be in observance of all High Jewis Holidays and be able to participate in the approprite Rituals.

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Resident Signature: *Michael Lember____*    Date: 5-11-07

IL462-5001 (R-6-06)    Distribution:  Master File; Resident    Page 1 of 2

State of Illinois
Department of Human Services

# TDF Resident Grievance



Grievance Examiner's Response:

The resident grieved on 5/11/07, since his arrival at TDF on 12/08/06, his religious rights and requests have been completely ignored. He notified the staff his that religious affiliation was Jewish and whenever possible he was like to keep and see a Rabbi. He even went so far as to give TDF staff the name of a Rabbi that would come this far to see him. Capt. Biermann told him under no circumstances would he be allowed to light Menorah candles on Chanukah in observance of the Jewish peoples exodus from slavery and bondage while in Egypt. Never mind the fact that TDF supplies matches to the residents. In this grievant's opinion, ignoring a person's fundamental right to observe there religious rights is akin to denial and unconscionable, bordering on criminal.

Grievant's requested relief is he wants a diet that is consistent with his religious beliefs. He wants to see a Rabbi. He wants to be in observance of all high Jewish holidays and be able to participate in appropriate rituals.

Per administrative review, Capt. Biermann confirmed to me that residents are not allowed to have or burn candles for any reason. If you know a Rabbi who is willing to visit you at TDF, write him a letter asking that he contact the Facility Director, Mr. Brian Thomas, for further instructions. Or you may ask your Primary Therapist to assist you in accessing your Rabbi of choice. I contacted the resident's therapist and was told the resident has never approached him about seeing a rabbi. Kosher is a type of diet for which the resident provided no details. The resident does not name who specifically ignored his requests to make contact with a Rabbi whose name he provided to me - Binyomin Scheiman, 901 N. Margail, Des Plaines, IL 60016, Ph# 847-334-1770.

It is recommended this grievance Denied. The resident's Primary Therapist should verify the resident's religious beliefs before a grievance is filed.

5-24-07
GV 0350
Lemberger, M

Grievance Examiner's Signature: _Sandra Simpson_     Date: _5/24/2007_

---

Date Received: _6-11-07_                          FACILITY DIRECTOR'S RESPONSE

Facility Director's Decision: Grievance:  ☐ Upheld   ☑ Denied

Behavior Committee Decision Appeal:  ☐ Upheld   ☐ Denied

Response:

Facility Director Signature: _____     Date: _6-11-07_

---

NOTE: If appealing the Facility Director's Decision, please attach the Grievance Appeal Form and forward to Grievance Examiner

Date Received: _7/6/07_              PROGRAM ADMINISTRATOR'S RESPONSE

Program Administrator Concurs With The Facility Director's Decision:  ☑ Yes   ☐ No

Response:

Program Administrator Sigature: _____     Date: _7/6/07_

IL462-5001 (R-6-06)                  Distribution: Master File; Resident                  Page 2 of 2

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 765874 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

Young v. Bass
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
**Ricky YOUNG**, Plaintiff,
v.
Mary BASS, Judy Bukowski, Thomas Monahan,
Timothy Budz, Robert Glotz, Symon Hopson,
Edward Smith, Raymond Wood, Travis Heinze, and
Liberty Healthcare Corporation, Defendants.
**No. 01 C 7944.**

April 7, 2004.

**Ricky Young**, Joliet, IL, pro se.
Robert Emin Sidkey, Pretzel & Stouffer, Chtd.,
Chicago, IL, for Plaintiff.
Shirley R. Calloway, Illinois Attorney General's
Office, Steven M. Puiszis, James Constantine
Vlahakis, Hinshaw & Culbertson, Chicago, IL,
Andrew Michael Ramage, Hinshaw & Culbertson,
Springfield, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*
DARRAH, J.
**\*1** Plaintiff, **Ricky Young**, filed suit against Mary
Bass, Judy Bukowski, Thomas Monahan, Timothy
Budz, Robert Glotz, Symon Hopson, Edward Smith,
Raymond Wood, Travis Heinze, and Liberty
Healthcare Corporation. Plaintiff alleges that he was
denied his right to freely exercise his religion, in
violation of 42 U.S.C. § 1983. Presently before the
Court is the Motion for Summary Judgment of
Defendants Bass, Bukowski, Monahan, Budz, Glotz,
and Hopson. For the following reasons, the motion is
granted.

*LEGAL STANDARD*

Summary judgment is appropriate when no genuine
issue of material fact exists and the moving party is
entitled to judgment as a matter of law.Fed.R.Civ.P.
56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor
Serv., Inc.,* 40 F.3d 146, 150 (7th Cir.1994)."One of
the principal purposes of the summary judgment rule
is to isolate and dispose of factually unsupported
claims or defenses...."*Celotex Corp. v. Catrett,* 477
U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986). Thus, although the moving party on a motion
for summary judgment is responsible for
demonstrating to the court why there is no genuine
issue of material fact, the non-moving party must go
beyond the face of the pleadings, affidavits,
depositions, answers to interrogatories, and
admissions on file to demonstrate, through specific
evidence, that a genuine issue of material fact exists
and to show that a rational jury could return a verdict
in the non-moving party's favor. *Celotex,* 477 U.S. at
322-27;*Anderson v. Liberty Lobby, Inc.,* 477 U.S.
242, 254-56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986);
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d
538 (1986); *Waldridge v. American Hoechst Corp.,*
24 F.3d 918, 923 (7th Cir.1994).

Disputed facts are material when they might affect
the outcome of the suit.*First Ind. Bank v. Baker,* 957
F.2d 506, 507-08 (7th Cir.1992). When reviewing a
motion for summary judgment, a court must view all
inferences to be drawn from the facts in the light
most favorable to the opposing party.*Anderson,* 477
U.S. at 247-48;*Popovits v. Circuit City Stores, Inc.,*
185 F.3d 726, 731 (7th Cir.1999). However, a
metaphysical doubt will not suffice.*Matsushita,* 475
U.S. at 586. If the evidence is merely colorable or is
not significantly probative or is no more than a
scintilla, summary judgment may be granted.
*Anderson,* 477 U.S. at 249-250.

*BACKGROUND*

The undisputed facts, for the purposes of this motion,
taken from the parties' Local Rule 56.1(a) & (b)
statements of material facts (referred to herein as
"Pl.'s 56.1" and "Def's 56.1") and exhibits, are as
follows.

Plaintiff, who is indigent, has been in the custody of
the Department's Sexually Violent Persons Unit at
either the Sheridan or Joliet Treatment and Detention
Facilities in Illinois. He had been under the care of
the Department since October 2000; and his formal
commitment began on April 25, 2002. Pl.'s 56.1 ¶ 1,
Def.'s 56.1 ¶ 1. Until April 2002, Plaintiff was a civil
detainee, which means that he was incarcerated based
upon a probable cause finding under the Sexually
Violent Persons Act. After April 25, 2002, Plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 765874 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

was civilly committed under the Sexually Violent Persons Act. Def.'s Ex. E, Budz Dep. at 15. Plaintiff follows the Muslim faith, and he has affiliated himself with the Moorish Science Temple of America. Def.'s 56.1 ¶ 2.

**\*2** Budz is the Facility Director of the Illinois Sexually Violent Persons Treatment and Detention Facility in Joliet, Illinois. He has held that position since January 4, 1999, and is responsible for the overall operations of the site. These responsibilities include the Program's security, the treatment in the Program, the healthcare, the business office, and all of the Facility's operations and engineering. Def.'s 56.1 ¶ 10. As Facility Director, Budz also recommends and formulates new policies and facilitates them through the Department's approval process, as well as ensuring enforcement of policies. Budz helps to revise the Department's Resident Handbook, which governs the residents of the Joliet Facility. He has the authority to change practices within the Facility that are not program directives that the Secretary of the Department formalizes into policy. Def.'s 56.1 ¶ 11.

Glotz was employed as the Security Director of the Joliet Facility. Def.'s 56.1 ¶ 12. He helped to formulate the policy, and his staff carries out the policy. Def's 56.1 ¶ 13.

Hopson is employed by the Facility as a security supervisor, in the position of Executive II. He began working for the Department in November 2000 as an internal investigator, and he was promoted to the position of Executive II in September 2001. Def.'s 56.1 ¶ 14. Hopson's duties as an Executive II are to supervise security matters, which cover the safety of the inmates, the employees, and the building. Def.'s 56.1 ¶ 15. He is also responsible for making sure the policies are enforced, and he makes suggestions for policy changes. Def.'s 56.1 ¶ 16. However, complaints of discrimination do not fall within Hopson's duties. Hopson has no involvement in the food content or its service at the Facility, as well. Def.'s 56.1 ¶ 17.

Muslims are not allowed to eat or otherwise consume any product made from a pig. Def.'s 56.1 ¶ 50. Moreover, a Muslim has a duty of diligence to make inquiry if he believes that food contains pork or a pork by-product. That duty does not extend to milk because it does not include pork by-products. Def.'s 56.1 ¶ 52. Plaintiff never consumed any of the items

he contends contained pork; and there would be other food items present, such as roast beef, baked potatoes, and salad. Typically, these extra items would be enough food to eat. Def's 56.1 ¶¶ 50-51.

Food service at the Joliet Facility is contracted through the Aramark Corporation. Oliver Hassett is the Food Service Director of Aramark. Def.'s 56.1 ¶ 54. Budz approved the contract with Aramark and approved the meals served at the Joliet Facility. Def.'s 56.1 ¶ 55. Aramark does not use pork or pork by-products in any of its meals. Def.'s 56.1 ¶ 56.

Once a year, all Muslims take part in Ramadan, which involves fasting from sunup until sundown for thirty days. Def.'s 56.1 ¶ 44. Muslims are encouraged to eat before dawn and must break their fast on time at sundown; however, eating before dawn is not a religious requirement. Def.'s 56.1 ¶ 47. The Department makes accommodations for the Muslim residents at the Joliet Facility who are observing Ramadan. Those residents get a sack breakfast before sunrise and after sunset, and, are allowed a meal with double portions to make up for the missed lunch meal. Def.'s 56.1 ¶ 45; Pl.'s 56.1 ¶ 15. Typically, Plaintiff receives breakfast before sunrise during Ramadan while at the Sheridan Facility; and if he receives his breakfast after sunrise at the Joliet Facility, Plaintiff would not eat those meals. Def.'s 56.1 ¶ 46. However, during the 2001 Ramadan period, the Department did not know when Ramadan started; and Plaintiff was prevented from fasting properly for two days. Pl.'s Resp. to Def.'s 56.1 ¶ 45, Pl.Ex. 1, Pl.'s Dep. at 19-20.

**\*3** The Islamaic religion does not mandate the portions of food that an observer of Ramadan should eat, but the spirit of fasting seems to encourage that observer's reduce their intake of food. Def.'s 56.1 ¶ 49. When Plaintiff did not participate in Ramadan, one meal a day sustained Plaintiff adequately; and Plaintiff was not very concerned that he was not getting enough to eat during Ramadan. Rather, Plaintiff was more concerned with the principle that the other detainees were receiving two food trays, one each for lunch and dinner, while Plaintiff only received one tray during Ramadan. Def.'s 56.1 ¶ 48.

Plaintiff used to own a Koran but gave it away because he thought he was going to be released. Def.'s 56.1 ¶ 22; Pl.'s Resp. to Def.'s 56.1 ¶ 22. The Joliet Facility has a library, but Plaintiff has never visited that library. It is thought that the library

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 3
Not Reported in F.Supp.2d, 2004 WL 765874 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

contains a copy of the bible and the Koran, but it does not contain the Circle 7 Moorish version of the Koran. Def.'s 56.1 ¶ 23; Pl.'s Resp. to Def.'s 56.1 ¶ 23.

Defendants did not provide Plaintiff with a prayer rug, a Fez, a Koran, or any other religious materials. The Department does not provide or sell religious items to the residents at the Facility. Neither the Joliet Facility nor the State of Illinois provides or sells religious items to the residents. Many factors are considered in using general revenue funds, such as the State's obligation to meet the basic and rehabilitative needs of the residents at the Joliet Facility. Def.'s 56.1 ¶ 24.

Specifically, religious items, such as Fezzes, Kufis, and prayer rugs, are not available in the commissary at the Facility nor are they provided by the Department. Pl.'s 56.1 ¶ 6. The commissary is available to Facility residents so that they can purchase food products and some office supplies both within the Facility and from an outside entity. Pl.'s 56.1 ¶ 10. The Facility would not object to selling religious items, but the commissary could not provide every possible item because of its limited space. Def.'s Resp. to Pl .'s 56.1 ¶ 10; Def. Ex. F., Budz Dep. at 31-32. Budz and Glotz both told Plaintiff he would have to buy his own religious materials, but Plaintiff had no money to purchase these items. Pl.'s 56.1 ¶ 7. It was expected that detainees would buy religious items from his or her own trust fund. Pl.'s 56.1 ¶ 11.

However, a resident can get clothing and religious items through different sources. Residents may purchase their own religious items or obtain them through donation. The Department employees would also allow religious items into the Department when they came in through the mail or UPS. Def.'s 56.1 ¶ 26.

Volunteers are allowed to come to the Facility and dispense religious materials without any restriction on the religion. No one at the Facility has ever kept a religious leader from visiting a resident, but the Facility does not provide a phone book to residents to contact religious leaders. Pl.'s Resp. to Def's 56.1 ¶ 31; Def.'s 56.1 ¶ 31. Plaintiff never made a request to put an Imam, a Muslim religious leader, on his visitor list; and he has never asked any other religious leaders about contacting an Imam, though he has written to at least one Imam. Def.'s 56.1 ¶¶ 30, 32.

Plaintiff has spoken to some Security Therapy Aides at the Facility whose father is an Imam. He never asked them for a phone number to contact this Imam. Def.'s 56.1 ¶ 33. Plaintiff, though, did speak with a doctor at the Facility who agreed to answer his questions about Islam. Def.'s Resp. to Pl.'s 56.1 ¶ 9. No Imam has ever visited with Plaintiff. Pl.'s 56.1 ¶ 14.

**\*4** Plaintiff wears a skull cap or stocking cap when praying and often times uses a baseball cap to cover his head. Under traditional Orthodox Islamic teachings, this practice would normally suffice, although Plaintiff has learned that he is required to keep his head covered at all times. Def.'s 56.1 ¶ 38; Pl.'s Resp. to Def.'s 56.1 ¶¶ 6, 38. The Department, though, does not allow the residents at the Joliet Facility to wear hats in common areas, such as the dietary area, unless they have permission. This policy has existed since the Program began in 1996. Def.'s 56.1 ¶ 39. This policy exists for security reasons because residents could hide items in a hat or a hat could signify a threat group, which could be divisive and cause disturbances to the common areas. Def.'s 56.1 ¶ 40.

On one occasion, Hopkins asked Plaintiff to remove his hat before going into the dietary area. Plaintiff said that he was wearing the hat for religious reasons; and Hopson would have let him continue wearing the hat that day based on this explanation, but Plaintiff would need to have a religious leader write a letter explaining that Plaintiff could wear a hat. Plaintiff refused this request and left the dietary area. Def.'s 56.1 ¶ 41; Pl.'s Ex. 1, Pl.'s Dep. at 51-52. Plaintiff told Glotz that he did not have a Kufi, an Islamic head covering; but he was getting one. Glotz asked Plaintiff if he needed help getting a Kufi, but Plaintiff refused. Glotz then allowed Plaintiff to wear his hat into the dietary area. Def.'s 56.1 ¶ 42. Glotz subsequently made a specific order allowing Plaintiff to wear his hat in the common areas of the Joliet Facility because Plaintiff was wearing a baseball cap instead of a Kufi. Def.'s 56.1 ¶ 43.

Budz knew Plaintiff followed Islam, and the Muslims follow the Koran, observe Ramadan, and cannot eat pork or pork by-products. Budz was also aware that Plaintiff complained to someone at the Facility, Dr. Edward Smith, about his meals. Budz was also aware that Plaintiff could not visit with an Imam. Pl.'s 56.1 ¶ 15; Def.'s Resp. to Pl.'s 56.1 ¶ 15.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                            Page 4
Not Reported in F.Supp.2d, 2004 WL 765874 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

*ANALYSIS*

Plaintiff initially brought claims against Defendants Bass, Bukowski, Monahan, Budz, Glotz and Hopson. Plaintiff, after reviewing the applicable law and conducting discovery, has voluntarily dismissed Defendants Bass, Bukowski, and Monahan from the case.

As to the remaining Defendants-Butz, Glotz, and Hopson-Plaintiff contends that his right to freely exercise his religion, Islam, has been impermissibly burdened in four ways. First, Plaintiff contends that Defendants did not provide Plaintiff with a diet that met the requirements of Islam. Second, Plaintiff asserts that Defendants failed to provide any means for Plaintiff to obtain religious materials. Third, Plaintiff claims that he was denied access in seeing an Imam. Finally, Plaintiff argues that Defendants did not allow Plaintiff to keep his head covered, as mandated by his religion.

**\*5** Pretrial detainees and other persons who have been involuntarily committed "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."*Youngberg v. Romeo,* 457 U.S. 307, 321-22, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). However, government officials may still place certain restrictions on the rights of pretrial detainees because it has legitimate interests in managing the facility where an individual is detained. As long as these measures are reasonably related to the effective management of the confinement facility, they are not considered punishment for a crime the detainee is suspected of committing. *Rapier v. Harris,* 172 F.3d 999, 1002-03 (7th Cir.1999)(*Rapier* ).

In determining whether a particular measure is reasonably related to the function of pretrial confinement, courts are required to give deference to the professional expertise of the corrections officials. Unless substantial evidence exists in the record showing the officials have exaggerated their response in considering the management of the confinement facility, courts should defer to the confinement officials' expert judgments. *Rapier,* 172 F.3d at 1003.

Pretrial detainees do not lose their first amendment rights to freely exercise religion just because they are incarcerated. *See Al-Alamin v. Gramley,* 926 F.2d 680, 686 (7th Cir.1991)(*Al-Alamin* ). Confinement

facility authorities are required to make reasonable accommodations to an inmate's or detainee's religious desires. *Sasnet v. Litscher,* 197 F.3d 290, 292 (7th Cir.1999). However, a detainee's free exercise of his "religious beliefs does not depend upon his ability to pursue each and every aspect of his religion."*Canedy v. Boardman,* 91 F.3d 30, 33 (7th Cir.1996).

Plaintiff first contends that he received a diet that did not meet the requirements of Islam. Specifically, Plaintiff argues that he was given pork sausages on at least three separate occasions; and he was given white bread and Jell-O, which may have contained pork by-products. Plaintiff further asserts that on eight or nine occasions during two Ramadan periods, the meals he received were improper because they either contained pork, were not served at the proper time, or his dinner was not a double meal, which should have additionally included Plaintiff's lunch meal.

As to his first argument, Plaintiff has not demonstrated that a genuine issue of material fact exists regarding his claim that he was served pork or pork by-products. The meals at the Joliet Facility were provided by Aramark. It is undisputed that these meals did not contain pork or pork by-products. Plaintiff has failed to produce any affidavits, depositions, answers to interrogatories, or admissions to the contrary, and Plaintiff's subjective belief that he was served pork fails to create a genuine issue of material fact. *Beer Capitol Distrib., Inc. v. Guinness Bass Import Co.,* 290 F.3d 877, 880 (7th Cir.2002).

**\*6** As to his second argument, as discussed above, it is undisputed that Plaintiff did not receive any meals containing pork or pork by-products. It is also undisputed that Plaintiff, during the 2001 Ramadan, only was prevented from properly fasting for two days. Significantly, Plaintiff has not produced any affidavits, depositions, answers to interrogatories, or admissions alleging that Defendants routinely prevented Plaintiff from properly fasting by serving his meals at the wrong time during Ramadan. *See Rapier,* 172 F.3d at 1006 n. 4. Therefore, this incident presents a *de minimis* burden on Plaintiff's free exercise of his religion and fails to rise to a constitutional dimension. *See Rapier,* 172 F.3d at 1006 n. 4.

Of the remaining six or seven instances that Plaintiff was not served proper meals during Ramadan, Plaintiff contends that the dinner he received was not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 5
Not Reported in F.Supp.2d, 2004 WL 765874 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

a double meal, which should have additionally included Plaintiff's lunch meal. "Inmates also have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." *McElyea v. Babbit,* 833 F.2d 196, 198 (9th Cir.1987).

However, Plaintiff does not dispute that one meal a day provided Plaintiff with food sufficient to sustain him in good health while he was not participating in Ramadan. Plaintiff also does not dispute that he was more concerned with the principle that the other detainees were receiving two food trays, one each for lunch and dinner, while Plaintiff only received one tray during Ramadan. Plaintiff does not further dispute that Islam does not mandate the portions of food that an observer of Ramadan should eat, and the spirit of fasting does seems to encourage reducing the intake of food. Thus, Plaintiff's alleged injury is not that he was denied the right to be provided with food sufficient to sustain him in good health and that satisfies the dietary laws of Islam. Plaintiff complains that other detainees were receiving more food. This complaint does not present a constitutional injury; and, accordingly, Plaintiff has failed to demonstrate that a genuine issue of material fact exists as to whether he received any meals that did not meet the requirements of Islam.

Plaintiff next asserts that Defendants failed to provide any means for Plaintiff to obtain religious materials. Plaintiff argues that Defendants should have provided prayer rugs, Fezzes, a Circle 7 Koran of the Moorish Science Temple, and other religious materials at either no cost or through the commissary so that indigent detainees, such as Plaintiff, can purchase religious materials at low costs.

Although confinement facility authorities are required to make reasonable accommodations to suit a detainee's religious desires, these authorities are not required to supply every detainee with religious materials at no cost. *Cf. Allen v. Tombs,* 827 F.3d 563, 569 (9th Cir.1987) (holding that prison administrators are not required to provide each inmate with the spiritual counselor of his choice). This is because confinement facilities, like the Joliet Facility, must consider many factors in using general revenue funds, such as the State's obligation to meet the basic and rehabilitative needs of the residents at the Joliet Facility. *See Al-Alamin,* 926 F.2d at 686. Providing every possible religious item desired by a detainee at no cost, in the professional judgment of the Joliet Facility officials, would not be economically feasible and would not be feasible based on the space available at the Joliet Facility. It would be practically impossible to stock the commissary with every religious item desired by the detainees.

**\*7** Plaintiff also argues that the Joliet Facility commissary could sell only religious items small in size. However, if the Joliet Facility only sold certain small religious items, it would be required to pick and choose between religious items and raise issues and complaints regarding the justification of the selection of some religious items and rejection of others. *See Sasnett,* 197 F.3d at 292-93. Therefore, in the professional judgment of the Joliet Facility officials, it would be better not to sell any religious items in the commissary.

The Joliet Facility does permit detainees access to religious materials through other means. Detainees may receive items through donations, and Joliet Facility officials permit religious items into the Facility when they come in through the mail or UPS. Detainees may also purchase religious items by using money in their trust funds. The Joliet Facility provides religious texts, including the Koran, in its library, as well. Therefore, Plaintiff and other detainees are provided with reasonable accommodations to satisfy their religious desires. No genuine issue of material fact exists demonstrating that Defendants failed to provide Plaintiff reasonable access to religious materials.

Plaintiff also argues that he was denied access to an Imam. Specifically, Plaintiff asserts that he lacks access to a phone book or contact information for contacting an Imam. However, it is undisputed that Plaintiff has previously written to an Imam. It is further undisputed that Plaintiff, despite talking with two security guards whose father is an Imam, never sought the phone number of this Imam. Plaintiff has failed to produce any affidavits, depositions, answers to interrogatories, or admissions to the contrary. Therefore, Plaintiff has failed to demonstrate that a genuine issue of material fact exists as to whether he was denied access to an Imam.

Finally, Plaintiff contends that he was not permitted to wear his hat in the dietary area even though he is required to keep his head covered at all times for religious purposes. Plaintiff specifically claims that on one occasion, Hopkins told Plaintiff that he could

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not wear his hat in the dietary area unless Plaintiff obtained a letter from a religious leader.

Although hats cannot be worn in common areas because of security concerns, it is undisputed that Hopkins would have permitted Plaintiff to enter the dietary area on this particular occasion with his hat on, even though he did not have a letter from a religious leader. Moreover, it is undisputed that Plaintiff was then allowed by Glotz to enter the dietary area and the remainder of the common areas with his baseball cap. Thus, even if Plaintiff was prevented from wearing a hat on one occasion, this incident is also *de minimis* and does not rise to a constitutional burden on Plaintiff's free exercise of religion. *Rapier,* 172 F.3d at 1006 n. 4. Plaintiff has failed to produce any affidavits, depositions, answers to interrogatories, or admissions to the contrary. Therefore, no genuine issue of material fact exists demonstrating that Plaintiff was prevented from wearing a hat for religious reasons.

*CONCLUSION*

**\*8** For the foregoing reasons, the Motion for Summary Judgment by Defendants Budz, Glotz, and Hopson is granted. Defendants Bass, Bukowski, and Monahan are voluntarily dismissed.

N.D.Ill.,2004.
Young v. Bass
Not Reported in F.Supp.2d, 2004 WL 765874 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.